## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JONATHAN PEOPLES, individually and on behalf of all others similarly situated,

                   Plaintiff,

          v.

COOK COUNTY, and THOMAS J. DART, Sheriff of Cook County,

                  Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

19 C 7712

## <u>MEMORANDUM OPINION</u>

**CHARLES P. KOCORAS, District Judge:**

In this lawsuit brought under 42 U.S.C. § 1983 and the Constitution and laws of the State of Illinois, Plaintiff Johnathan Peoples claims his constitutional rights were violated by the Cook County Sheriff's Office's ("CCSO") policy or practice of "detaining and re-incarcerating people after they are sentenced to time served without legal justification to do so." Dkt. # 1-1, ¶ 10. Before the Court is Defendants Cook County and Sheriff Thomas J. Dart's[1] Motion for Summary Judgment under Federal Rule of Civil Procedure 56. The Motion is granted in part.

To summarize the relevant events, Plaintiff voluntarily pleaded guilty to a felony charge on February 15, 2019, the Friday afternoon before a holiday weekend. Plaintiff

---

[1] Dart is sued in his official capacity. Official capacity suits are simply "another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). In this case, that entity is the CCSO.

was sentenced to one year in the Illinois Department of Corrections ("IDOC") and one year of mandatory supervised release ("MSR") with 217 days credit towards his jail sentence. Following the imposition of his sentence, Plaintiff was ordered into the custody of the CCSO for the purpose of transporting him to the custody of the IDOC.

The hours for acceptance of new detainees at the Illinois Department of Corrections Northern Reception Classification Center ("IDOC-NRC") ended at 1:30 p.m. that Friday afternoon. As such, Plaintiff remained in the custody of the CCSO until he could be transported to the IDOC, per the court's order, when it opened after the holiday weekend. The transfer to the IDOC-NRC was made on Tuesday, February 19, 2019.

Based on the timing of legal and necessary events, and policies applicable to all persons similarly convicted in Cook County circuit courts, Plaintiff was not subjected to any circumstance that was arbitrary, unreasonable, or motivated by deliberate indifference. That the weekend included a recognized holiday was a consequence of the plea of guilty proffered on the Friday before the holiday.

**<u>BACKGROUND</u>**

In resolving a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The following facts are taken from the record and are undisputed unless otherwise noted.

2

The CCSO is responsible for running the Cook County Department of Corrections ("CCDOC"). Illinois law requires the CCSO to "receive and confine in such jail, until discharged by due course of law, all persons committed to such jail by any competent authority." 730 ILCS 125/4. Illinois law also requires the CCSO to obey lawful orders of the court. 55 ILCS 5/3-6023 ("Each sheriff shall, in person or by deputy, county corrections officer, or court security officer, attend upon all courts held in his or her county when in session, and obey the lawful orders and directions of the court, and shall maintain the security of the courthouse."). CCSO Court Services deputies are assigned to Cook County courthouse locations where they are responsible for, *inter alia*, obtaining court documents such as sentencing and commitment orders and obeying the lawful orders and directions of the court, including taking individuals into custody following their guilty verdict or plea.

### CCSO 2019 Policies

In 2019, individuals sentenced to the IDOC were transported from the sentencing courthouse to the Cook County Jail ("Jail") on the same day as their guilty plea or verdict. If the individual was sentenced in one of the remote courthouses, they were transported to the Jail by the CCSO on buses that ran between the remote courts and the Jail. Once at the Jail, all individuals with commitment orders were processed through the Receiving Unit at the Jail.

Courtroom deputies from Court Services were responsible for gathering the paperwork from the clerk of the court and bringing it the Receiving Unit. If detainees

were coming from one of the outlying courthouses, the court paperwork was brought to the Receiving Unit at the time of their transport. The Receiving Unit then brought the paperwork to the CCDOC Record Office. A lot of times, it took the clerk of the court "a while" after the end of the court call to put the paperwork together and give it to a Sheriff's deputy to bring back to the Jail. Dkt. # 82, ¶ 19.

Supervisory staff in the Record Office reviewed the paperwork from the court and determined who would remain in CCDOC custody and who would be discharged. They also input information into the jail management system, Cook County Offender Management System. All paperwork related to individuals sentenced to IDOC (regardless of any credit they may have toward their IDOC sentence) was segregated and reviewed by administrative assistants within the Record Office who were assigned to the "IDOC Desk." The release review conducted by the IDOC Desk included setting up transport for the individuals sentenced to IDOC from CCDOC to IDOC.

After receiving an order of commitment to IDOC, the Record Office scheduled transport of detainees to the IDOC-NRC to occur the next business day, unless the judge indicated there was a stay. In advance of the transport of individuals from CCDOC to IDOC-NRC, the CCDOC Record Office emailed commitment orders to IDOC.

CCDOC Policy 717 sets forth the CCDOC's policy related to inmate release. It states that, "it is the policy of the [CCDOC] to provide for the timely, efficient and legal release of inmates." Dkt. # 82, ¶ 29. It was the CCDOC's practice to transport individuals, along with their commitment orders, to IDOC by a Cook County bus or

4

other mode of transportation. The CCDOC's practice was to try to arrive at IDOC with individuals sentenced to IDOC by 8:00 a.m.

CCDOC Policy 702 sets forth the process for intake of anyone that comes into the custody of the CCDOC. Section 706.6.2 (Inmate Separation) states that "[i]nmates should be kept separate from the general population during the admission process. Newly admitted inmates should be separated according to the facility's classification plan." Dkt. # 82, ¶ 16. Individuals already in the Sheriff's custody and housed within the Cook County Jail at the time of their court appearance were sent back to their housing unit by the Receiving Unit. If an individual was not previously in a housing unit (i.e., they were out on bond or on electronic monitoring), the individuals were classified and given a jumpsuit before they were put into a living unit in the divisions. The Classification Unit is not provided with information related to whether someone is expected to be a turnaround at IDOC and therefore does not take that information into consideration when determining placement.

### IDOC-NRC Hours of Operation

In 2019, IDOC-NRC accepted transfers of male individuals from CCDOC on Mondays, Tuesdays, Thursdays, and Fridays from 8:00 a.m. until 1:30 p.m. They did not accept transfers on weekends or holidays. Thus, if an individual was sentenced on a Friday, and Monday was a holiday, the individual would not be transported to IDOC until the following Tuesday.

*IDOC Policies and Procedures*

Pursuant to Illinois law, in 2019, every IDOC sentence included a term of mandatory supervised release ("MSR") in addition to the term of imprisonment, except when a term of natural life was imposed. IDOC has sole legislative authority for managing and processing the release of IDOC inmates onto MSR. 730 ILCS 5/3-3-7(a) ("The conditions of every parole and mandatory supervised release are that the subject: . . . [] be evaluated by the Department of Corrections prior to release using a validated risk assessment and be subject to a corresponding level of supervision."); 5/3-3-7(c) ("The conditions under which the parole or mandatory supervised release is to be served shall be communicated to the person in writing prior to his or her release, and he or she shall sign the same before release.").

IDOC considers a person to be a "turnaround" if they have "been found guilty by plea or trial of a felony in Cook County and sentenced to a term in IDOC that included credit equal or exceeding the amount of time required to be served by them under their sentence and who the CCSO is to deliver to the IDOC for the purposes of processing them out of custody." Dkt. # 82, ¶ 39. If a person has a one-year sentence, is required to serve 50% of the sentence, and is credited with at least 180 days of jail credit, the person has fulfilled their jail sentence. Their jail sentence is considered fulfilled at the time of their release, but their parole/MSR is not.

During February of 2019, when IDOC-NRC clerical staff received copies of sentencing and commitment orders via email from CCDOC, they were able to review

the Orders and identify likely turnarounds in advance of their arrival at IDOC. Based on the information provided by the CCSO in advance of the likely turnarounds' arrival at IDOC-NRC, those individuals were separated from the other detainees so they could be processed and released from IDOC-NRC on the same day they arrived.

IDOC processing of turnarounds includes a check of the sentencing order by clerical staff to ensure it contains the necessary components. IDOC policy requires IDOC to ensure accurate calculation of all sentences and ensure timely release of offenders. This task is performed by the Record Office supervisor. Turnarounds also must fill out parole paperwork.

Individuals identified as turnarounds must be fingerprinted and photographed and undergo DNA swabs when required. The Bureau of Identification takes fingerprints from the individual which are then compared to the fingerprint codes on LEADS. The Bureau of Identification then fills out a form verifying that the person being released is the person who was fingerprinted. The Bureau of Identification also takes photographs and DNA samples from each offender, including turnarounds. All individuals, including turnarounds, are required by IDOC to go through medical at IDOC and see a counselor before they are released.

### CCSO & IDOC Policies Post-March 2020

During the COVID-19 pandemic, from May 2020 to approximately August of 2020, the Governor of Illinois ordered that no individuals be transferred to IDOC, including Stateville. During that time, turnarounds were processed by IDOC from the

Cook County Jail. All IDOC processes were handled by IDOC remotely, except for fingerprinting, photographing, DNA-swabbing, and parole paperwork signing, which occurred at the Cook County Jail where IDOC's Bureau of Identification personnel and a parole agent traveled to perform such tasks.

At some point during the COVID-19 pandemic, the court allowed individuals on electronic monitoring who were sentenced to IDOC to return home after sentencing. The Sheriff was then required to pick them up and transport them to IDOC the following business day. There is no evidence that the CCSO has ever had the discretion to permit a person convicted and sentenced to IDOC to return home before transport to IDOC, for a judge must order that an individual be placed on electronic monitoring. The language on the form commitment and sentencing order that orders the CCSO to take the defendant into custody and transport him to the custody of IDOC has not changed since the onset of the COVID-19 pandemic.

When IDOC processed persons on-site at the Cook County Jail during the COVID-19 pandemic, it used IDOC's digital LiveScan machine to take fingerprints and photographs of the persons being released onto MSR. A computer was attached to the LiveScan machine that digitally captured the photograph and fingerprint for identification purposes. Defendants admit the CCSO has its own LiveScan machine to take photographs and fingerprints which it uses to transmit information to the Illinois State Police, but deny that the CCSO LiveScan machine enables the CCSO to transmit information to IDOC for upload into their tracking system.

8

As of at least November 2021, the CCSO performs its own calculation to identify turnarounds to be brought to IDOC, although the post-pandemic procedures have not altered IDOC's policy of conducting its own calculation.

### *Facts Specific to Plaintiff Peoples*

On December 11, 2018, while on felony probation, Plaintiff was arrested and charged with felony offenses, including unlawful possession of a controlled substance. After approximately 45 days in the Cook County Jail, Plaintiff was released on bond. On January 10, 2019, Plaintiff was placed in the CCSO's electronic monitoring program. Plaintiff was in the custody of the CCSO while he was on electronic monitoring in January and February, including on February 15, 2019.

On Friday, February 15, 2019, Plaintiff appeared in court at the Circuit Court of Cook County's Maywood, Illinois courthouse. His case was called around 1:00 p.m., and he pleaded guilty to possession of a controlled substance. The judge found Plaintiff guilty, sentenced him to one year in the custody of IDOC, and ordered him to serve one year of MSR. The judge also found Plaintiff was entitled to receive credit for time actually served in custody for a total of 217 days. Plaintiff knew when he pleaded guilty that he would not be going home directly and understood he would have to go to the Cook County Jail to be processed. At no time during the plea hearing did the judge tell Plaintiff that he could leave the courthouse and go home after the hearing.

The judge ordered the clerk of the court to "provide the Sheriff of Cook County with a copy of [the commitment and sentence] order." Dkt. # 82, ¶ 66. It was further

9

ordered that the Sheriff "take the [Plaintiff] into custody and deliver him[] to the Illinois Department of Corrections and that the Department take him[] into custody and confine him[] in a manner provided by law until the above sentence is filled." *Id.* at ¶ 67.

After the sentencing, CCSO courtroom deputies escorted Plaintiff to a temporary holding cell behind the courtroom where he sat by himself for one to two hours. Plaintiff was then transferred downstairs to a larger holding cell where he remained with other detainees for two to three hours.

As noted above, IDOC-NRC's hours of operation did not allow for Plaintiff to be transported to their facility that Friday evening, or at any time on the following Saturday or Sunday. IDOC-NRC's hours of operation also did not allow for Plaintiff to be transported to their facility on Monday, February 18, 2019, because it was a state and federal holiday.

Sometime after 4:45 p.m. on Friday, Plaintiff was taken by bus to the Cook County Jail where he was placed into another large holding cell for several hours until he was processed into the CCDOC. The intake process included a mental health exam, fingerprinting, and photographing. Plaintiff was not grouped by any security or offense classification during this time. After processing, Plaintiff was put into a holding cell for about another two hours before being taken to his housing unit in Division XI, a unit for medium/maximum security inmates.

Plaintiff was transported by the CCSO to the IDOC-NRC facility on Tuesday, February 19, 2019, where his processing included IDOC staff taking fingerprints,

10

collecting a DNA sample, and providing him with paperwork related to his term of MSR. He was released that same day after processing was complete.

On behalf of himself and others similarly situated, Plaintiff brought claims under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments, the Illinois Constitution, and state law. Defendants move for summary judgment in their favor on all claims as they pertain to Plaintiff Peoples only.

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cnty.*, 752 F.3d 708, 712 (7th Cir. 2014) (cleaned up).

In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1074 (7th Cir. 2016). The nonmovant "must go beyond the pleadings" to demonstrate that there is evidence "upon which a jury could properly proceed to find a verdict in [their] favor." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168–69 (7th Cir. 2013). And "[c]onclusory statements, not

grounded in specific facts" cannot defeat a motion for summary judgment. *Bordelon v. Bd. of Educ. of the City of Chi.*, 811 F.3d 984, 989 (7th Cir. 2016) (cleaned up).

Not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted). In deciding a motion for summary judgment, the Court's sole function is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). The Court cannot weigh conflicting evidence, assess the credibility of witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704–05 (7th Cir. 2011).

## DISCUSSION

Plaintiff brings claims against the CCSO under 42 U.S.C. § 1983, the Illinois Constitution, and Illinois state law. The Court addresses each claim in turn.

### I.    Plaintiff's Federal Claims

Plaintiffs like Peoples may sue municipalities under 42 U.S.C. § 1983 when their actions violate the Constitution. *See generally Monell*, 436 U.S. 658. To prevail on a *Monell* claim, plaintiffs must identify an action taken by the municipality, the requisite degree of culpability, and a causal link between the municipality's action and the deprivation of federal rights. *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997).

12

### A.    Violation of a Constitutional Right

Plaintiff must first establish a violation of a constitutional right.  Plaintiff asserts the CCSO's policies violated his rights under the Fourth, Eighth, and Fourteenth Amendments.

### 1.    Fourth Amendment

The Court first examines Defendants' argument that the Fourteenth Amendment applies under the circumstances and not the Fourth Amendment's protections against unreasonable search and seizure.  The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  The Supreme Court, however, has explained that "[o]nce a trial has occurred, the Fourth Amendment drops out: [a] person challenging the sufficiency of the evidence to support both a conviction and any ensuing incarceration does so under the Due Process Clause of the Fourteenth Amendment." *Manuel v. City of Joliet ("Manuel I")*, 137 S. Ct. 911, 920 n.8 (2017).  Per *Manuel I*, Plaintiff's guilty plea forecloses any Fourth Amendment challenge to his overdetention. *See Jones v. D.C.*, 2019 WL 5690341, at *4 (D.D.C. 2019).

It is true that other courts have allowed Fourth Amendment claims to proceed in similar circumstances where the plaintiffs sufficiently alleged a "fresh seizure" or "re-incarceration."  For example, in *Shultz v. Dart*, 2013 WL 5873325, at *2 (N.D. Ill. 2013), the plaintiff appeared in court, pleaded guilty to a misdemeanor offense, was sentenced to time served, and was told by the judge that he was free to leave.  Despite

being told he was free to leave, the plaintiff remained in the custody of the sheriff's department, was detained in a holding cell at the courthouse, and then transported back to Cook County Jail. *Id.* The defendants moved to dismiss, arguing the plaintiff fell outside of the Fourth Amendment's protections. *Id.* at *4. The court disagreed, stating that "after [the plaintiff] was sentenced to time served and told by the judge that he was free to leave, he once again became a free person and thus protected by the Fourth Amendment." *Id.*

In *Jones*, the plaintiff pleaded guilty and was sentenced to time served and ordered to be released from the department of corrections. 2019 WL 5690341, at *2. He was subsequently transferred to the D.C. Jail where he was held for several hours before being released. *Id.* While the district court found that the plaintiff's guilty plea foreclosed any Fourth Amendment challenge to his continued confinement, it nevertheless declined to dismiss the plaintiff's Fourth Amendment claim because "[a]ny confinement that [the plaintiff] experienced as punishment for his underlying conviction ended the moment he was sentenced to time served and ordered released. *Id.* "And DOC's subsequent decision to take him *back* into custody (either in the courtroom or upon his return to D.C. Jail) constituted an actual or constructive re-seizure of his person that required an independent justification." *Id.* (citing *Shultz*, 2013 WL 5873325, at *5) (emphasis in original).

Importantly, these cases were decided at the motion to dismiss stage, not summary judgment. And, as Defendants point out, a key distinction between Plaintiff's

14

case and those discussed above is that, in *Schultz* and *Jones*, the plaintiffs were sentenced to time served and were either told by the judge they were free to leave or specifically ordered released. Here, Plaintiff argues that the court's sentencing order, which credited Plaintiff with 217 days of time actually served on his one-year prison sentence, "indisputably ended any prison term of Plaintiff's sentence, leaving only one year of MSR." Dkt. # 83, at 5. The absence of an express direction from the judge—on a pre-typed form order—for Plaintiff's immediate release, Plaintiff says, is merely a matter of semantics. The Court disagrees.

In *Barnes v. District of Columbia ("Barnes I")*, the district court found that the group of plaintiffs stated a valid Fourth Amendment claim where they alleged that "despite being entitled to release, they were taken back into custody and transported to D.C. Jail . . . they allege[d] that they essentially were re-arrested or re-seized." 242 F.R.D. 113, 118 (D.D.C. 2007). At summary judgment, however, the court held that there was no "seizure" triggering the Fourth Amendment protections because the plaintiffs "were already in custody at the time they were ordered released or their sentences expired" and therefore their "freedom of movement had already been terminated." *Barnes v. District of Columbia ("Barnes II")*, 793 F. Supp. 2d 260, 274 (D.D.C. 2011). Additionally, the plaintiffs presented no facts suggesting that their overdetentions involved "fresh seizures" warranting a Fourth Amendment analysis. *Id.*

The Court similarly finds no "fresh seizure" in this case. Plaintiff was in the custody of the CCSO by virtue of his guilty plea. Per the sentencing order, Plaintiff

15

was to remain in the custody of the CCSO until he was transported to IDOC and processed. Incident to his guilty plea, Plaintiff was necessarily subject to certain administrative tasks before he could be released by IDOC. Plaintiff cannot show a violation of his Fourth Amendment rights.

### 2. Eighth and Fourteenth Amendments

Moving on, Plaintiff argues that even if the Court finds, as it has, that the Fourth Amendment is inapplicable, summary judgment should still be denied because Defendants violated Plaintiff's substantive due process rights under the Fourteenth Amendment. Alternatively, Plaintiff contends he has presented a triable Eighth Amendment claim. In their reply brief, Defendants argue Plaintiff's claims are more appropriately considered under Eighth Amendment, rather than the Fourteenth.

To be sure, authorities differ as to the source of the constitutional right at issue in "overdetention" cases such as this: some find it in the Due Process Clause of the Fourteenth Amendment, while others locate it in the cruel and unusual punishments clause of the Eighth Amendment. *See Shorts v. Bartholomew*, 255 F. App'x 46, 51–52 (6th Cir. 2007) (discussing divergent authority). In this case, Plaintiff's claims should proceed under the Eighth Amendment. *See, e.g., Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) ("After conviction, the Eighth Amendment 'serves as the primary source of substantive protection . . .' Any protection that 'substantive due process' affords convicted prisoners against excessive force is, we have held, at best redundant of that provided by the Eighth Amendment."); *Armstrong v. Squadrito*, 152 F.3d 564, 570 (7th

16

Cir. 1998) ("Armstrong's Eighth Amendment claim [for overdetention] falls away because that amendment applies only to a convicted prisoner rather than a pretrial detainee whose rights receive the protection of due process."); *Wharton v. Danberg*, 854 F.3d 234, 246–47 (3d Cir. 2017) (recognizing that while some other courts analyze over-detention claims under the Fourteenth Amendment, it has always applied the Eighth Amendment to such claims "because each of our over-detention cases involved convicted and sentenced inmates.").[2]

"Incarceration beyond the date when a person is entitled to be released violates the Eighth Amendment if it is the product of deliberate indifference." *Figgs v. Dawson*, 829 F.3d 895, 902 (7th Cir. 2016); *see also Burke v. Johnston*, 452 F.3d 665, 669 (7th Cir. 2006) ("[W]e agree that incarceration after the time specified in a sentence has expired violates the Eighth Amendment if it is the product of deliberate indifference."). "To defeat summary judgment on his Eighth Amendment claim, [Plaintiff] needs to prove that the defendants held him beyond the term of his incarceration without penological justification, and that the prolonged detention was the result of the defendants' deliberate indifference." *Armato v. Grounds*, 766 F.3d 713, 721 (7th Cir. 2014); *see also Aguilar v. Gaston-Camara*, 861 F.3d 626, 631 (7th Cir. 2017) (same).

---

[2] In any event, regardless of whether Plaintiff proceeds under the Eighth or Fourteenth Amendment, the analysis requires a showing of deliberate indifference. *Compare Alcocer v. Mills*, 906 F.3d 944, 953 (11th Cir. 2018) ("When an over-detention occurs and the Fourteenth Amendment governs the analysis, a plaintiff must demonstrate that the defendant acted with deliberate indifference to her due-process rights."), *with Courtney v. Butler*, 756 F. App'x 626, 627 (7th Cir. 2019) ("A plaintiff states an Eighth Amendment claim if he is detained in jail for longer than he should have been due to the deliberate indifference of corrections officials.") (internal quotation marks omitted).

17

"Deliberate indifference requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk." *Figgs*, 829 F.3d at 903.

It is well-recognized that although an inmate is entitled to timely release from prison, "'timely release' is not the same thing as instantaneous release: it is reasonable for jailers to have some administrative delay in processing an inmate's discharge." *Crittindon v. LeBlanc*, 37 F.4th 177, 188 (5th Cir. 2022); *see also Lewis v. O'Grady*, 853 F.2d 1366, 1370 (7th Cir. 1988) ("Reasonable time must be allowed for such matters as transportation, identity verification, and processing.").

In the Court's view, that Plaintiff's plea hearing took place on a Friday afternoon before a holiday weekend was unlucky, but it cannot be said that Plaintiff was incarcerated beyond his release date without penological justification. At all times, Plaintiff was in the lawful custody of the CCSO. Pursuant to the circuit court's sentencing order, Plaintiff had not yet completed his sentence. Plaintiff was not entitled to be released until he was transported to IDOC custody, had his sentence calculated, and was processed out on MSR. In other words, Plaintiff has not put forth sufficient evidence that would permit the conclusion that his Eighth Amendment rights were violated by the delay in transfer to IDOC custody or that the violation was due to deliberate indifference.

### B.    Remaining Elements of Plaintiff's *Monell* Claim

Even assuming that Plaintiff's so-called overdetention violated his constitutional rights, Plaintiff's claim still fails. Once a Section 1983 plaintiff shows that he was deprived a of a federal right, he must then trace the deprivation to some municipal action (i.e., a "policy or custom"), such that the challenged conduct is "properly attributable to the municipality itself." *First Midwest Bank ex rel. LaPorta v. City of Chi.*, 988 F.3d 978, 986 (7th Cir. 2021). There are at least three types of municipal action that may give rise to municipal liability under Section 1983: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Id.* (quoting *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)).

Next, the plaintiff must show that "the policy or custom demonstrates municipal fault," i.e., deliberate indifference. *LaPorta*, 988 F.3d at 986. "This is a high bar." *Id.* at 987. If a municipality's action is not facially unconstitutional, the plaintiff "must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *Id.* Finally, the plaintiff must show that the municipal action was "the 'moving force' behind the federal-rights violation." *Id.* (quoting *Brown*, 520 U.S. at 404). This "rigorous causation standard" requires "a 'direct causal link' between the challenged municipal action and the violation of [the plaintiff's] constitutional rights." *Id.* (quoting

19

*Brown*, 520 U.S. at 404). "In short, a *Monell* plaintiff must show that some municipal action directly caused him to suffer a deprivation of a federal right, and that the municipality took the action with conscious disregard for the known or obvious risk of the deprivation." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 236 (7th Cir. 2021).

Here, Plaintiff does not challenge an express CCSO policy. Rather, Plaintiff argues for *Monell* liability based on the CCSO's "admitted policy or practice" of "jailing persons while awaiting transfer to IDOC." Dkt. # 83, at 16. In order to succeed on his claim, then, Plaintiff must show that such a practice demonstrates deliberate indifference to his Eighth Amendment rights. This is where Plaintiff fails to meet his burden. Plaintiff has not raised a genuine issue of material fact which might lead to a conclusion that the CCSO maintained a policy or practice which was deliberately indifferent to his constitutional rights.

In arguing that the CCSO practice of detaining convicted felons—specifically, those who qualify as turnarounds—while awaiting transfer to IDOC amounts to deliberate indifference, Plaintiff primarily relies on changes in CCSO and IDOC practices that were implemented in response to the onset of the COVID-19 pandemic. Plaintiff faults the CCSO for not implementing certain technological fixes that would facilitate quicker processing of potential turnarounds. For example, Plaintiff points out that the CCSO has its own LiveScan machine that it uses to transmit certain information to the Illinois State Police. Plaintiff has not shown, however, that it would have been

possible for the CCSO to transmit the necessary information to IDOC, or that IDOC's own policies would permit such a practice.

Plaintiff also criticizes the CCSO because it has never utilized an "electronic or digital process which would permit IDOC to process persons remotely while such persons remain at the Cook County Jail."  Dkt. # 88, ¶ 14.  While this may be true, Plaintiff offers no evidence that such a process exists or is feasible, or that IDOC would be amenable to that process.

Moreover, and perhaps more importantly, the mere existence or possibility of other, better policies which may have been used is insufficient to prove deliberate indifference.  *Frake v. City of Chi.*, 210 F.3d 779, 782 (7th Cir. 2000); *accord Ayoubi v. Dart*, 724 F. App'x 470, 474–75 (7th Cir. 2018).  And, in any event, Plaintiff has not put forth evidence tending to show that his alleged overdetention would have been prevented by the various practices implemented in response to the pandemic.  On the record before the Court, Plaintiff cannot show that the CCSO's challenged practice was the "moving force" behind the alleged constitutional violation.

Defendants, on the other hand, introduced evidence showing that the CCSO had no discretion in determining whether a convicted felon could be released on electronic monitoring or kept in custody pending transfer to IDOC.  Release on electronic monitoring must be ordered by a judge.  The CCSO also has no control over when court hearings and sentencings take place.  Furthermore, the CCSO's practice was to transport convicted felons to IDOC custody the next business day after their guilty plea.  It was

21

IDOC-NRC's operating hours which caused the delay in transporting Plaintiff to IDOC. It was the practice of the CCSO Records Office to send completed paperwork to IDOC in advance or a transport, allowing IDOC to identify turnarounds prior to their arrival at IDOC-NRC and facilitating a timelier release. Plaintiff was promptly transported to IDOC-NRC as soon as IDOC-NRC's hours allowed.

Ultimately, it is up to IDOC to perform the final calculation of a convicted felon's prison sentence, process them, and release them onto MSR. While there may be flaws in the transfer process, these flaws simply do not rise to the level of deliberate indifference on the part of the CCSO. Again, "'timely release" is not the same as instantaneous release. *Crittindon*, 37 F.4th at 188. The Court therefore grants Defendants' motion for summary judgment on Plaintiff's Section 1983 claims.

## II. Plaintiff's State Law Claims

Because the Court grants summary judgment on Plaintiff's federal claims, the Court does not have subject matter jurisdiction, and thus declines to exercise its supplemental jurisdiction over Plaintiff's state law claims. 28 U.S.C. § 1367(c)(3). ("The district courts may decline to exercise supplemental jurisdiction [if] the district court has dismissed all claims over which it has original jurisdiction."); *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment [70] in part as to Plaintiff's Section 1983 claims and declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. Judgment is entered in favor of Defendants on Counts I and II of Plaintiff's Complaint. Civil case terminated.

It is so ordered.

Dated: February 9, 2023

Charles P. Kocoras
United States District Judge